I'd like to say five minutes for a bottle if I can, please. What's that big number in front of you? I beg your pardon? What's that big number in front of you? It says 15 on the clock. Yeah, when it gets down to five, whatever you've got left, you can save for a bottle. Whatever the number is, unless it's a negative number, in which case you are at my mercy. Then I'm out of luck. I wasn't sure if you changed the clock as some state courts do. Would you like me to get started? At your leisure. Thank you. May it please the Court, I'm Michelle Earl Hubbard on behalf of the plaintiffs, and I'm having trouble reaching this microphone. So you are fine. Just leave it right there. It won't reach it. Where it was, right up there, is fine. Okay. You can hear me just fine? You can, so just fine. Thank you. Thank you. With me in the courtroom today are a number of the representatives of the plaintiffs that have come here from Montana. We're going to focus our time today on the 1983 claims, so I'd be happy to address questions for any of the other many issues on appeal. Plaintiffs have several theories of liability in this case under 1983. I'd like to focus on three. The first is the hiring and failing to supervise teenage boys as attendants to girls' locker rooms and as an aide to a girls' gym teacher with an office in the girls' locker room. The second is supervisory liability of the individual defendants, and the third is the failure to respond to known risks and violations in the face of actual or constructive notice. It's not necessary for any of plaintiff's theories that this Court agree that the boys who did the filming were state actors. That is completely irrelevant. What we're dealing with here is the state action of the individual defendants and of the district. In order to find the school or the individual defendants liable for the hiring and failing to supervise the male cowboys and student aide, you have to find that the plaintiffs were deprived of a constitutional right. I think that that's a given. The girls have a constitutional right in their bodily privacy that was violated by the filming and the peeping and watching of their bodies. You also have to find that there was a policy practice custom of inadequate training and supervision and that in light of the duties assigned to the specific employee, the need for more or different supervision or training was so obvious, and the inadequacy so likely to result in a constitutional violation, that the policymakers can be said to have been deliberately indifferent to the need. Finally, you have to find... I'm sorry. You think that they should have anticipated these boys would be putting cameras in that girl's locker room and that they need to sort of train them ahead of time and say, don't do that, and train them not to do it? I'm not sure what you had in mind. There's two different doctrines that sort of merge in this case. One is the inappropriate hire in the first place, and the Brown versus Board case. There are all sorts of things that people shouldn't do in school. They shouldn't be selling drugs. They shouldn't be bringing guns to school. I hate to even talk about it because this kind of tragic thing does happen once in a while, but we presume that there's a certain degree of common sense. You don't have to sort of train people. Don't bring guns to school. Don't pull them out and shoot people. Don't point a camera at, you know, don't sneak in and point a camera at naked girls. I'm not sure that without some substantial showing of notice on the part of the school that they knew this was going on, that you can really point the finger at them. Well, Your Honor, what you really have to reach is the issue that there was some constructive or actual knowledge of a risk of harm. That's really the fulcrum of the case. Yes. And, Your Honor. If you have presented enough evidence such that if the case went to the jury on this evidence and the jury were to find in your favor, we could uphold the verdict. Yes. Then you can proceed. Yes. If your evidence is such that were you to present it to a jury and were you to succeed, we'd have to strike it down as unsupported, then you fail. I must tell you, so far I'm not persuaded that you've shown enough. Well, I think there are two. Maybe you can speak to that. Sure. There are two issues, and the first is you have to realize that these are employees who are skilled at dealing with teenage boys. They hired boys with jobs that would place them in an area where girls were going to be naked. I believe it is common knowledge that teenage boys have a possibility that they will want to peep at girls. You don't have to perceive the ultimate injury. This is not a peeping case. This is a taping case. But, Your Honor, if you look at the tort law that governs this case, they did not need to perceive the ultimate injury. They had to perceive the constitutional violation, which was the invasion of the girl's privacy in her naked body. Yes, the girls were filmed, but it was enough that they were peeped at. It was enough that the boy in the wall watched them. You don't have to foresee the scheme that ultimately arose. You simply have to see the constitutional violation. Let's talk about the boy in the wall. What did these defendants do to facilitate that? They hired boys who had the right to come and go from a girl's locker room during competitions. Because of that role, they were not questioned when they were in that room all the time. They were given 24-hour access to the school. There are several instances in the record where they were, in fact, seen by a staff person unsupervised in the locker room and were not evicted because of their role. Well, to deny that kind of job to boys, they are going to be sued for sex discrimination, just like the prison cases, the prison guard cases. I believe you actually could have. Remember Darth and Mrs. Rawlinson? Yes, Your Honor, but I believe that there is a fairly good line of cases that when you're going to have an individual who has access to the naked body of another, that it's better to have same-gender individuals. We, in fact, have an expert who testified to that. But you then have something you need to litigate. You have to then litigate the question of whether or not it's a BFOQ or whatever. I don't even know if Title VII would apply. I guess these were jobs. Were they paid for these jobs? They were paid for these jobs, Your Honor. So arguably, Title VII applies. Maybe it clearly applies. I don't know. I haven't looked into it. And so if they say, boy, girls only, so they find themselves sued by the boys for Title VII violations. And one of the issues, Your Honor, is not just the picking of these people, but it's the supervising. They gave these boys access and then completely failed to supervise them. The other issue you asked about notice is, in the record, it is indisputable that the superintendent knew he was given notice a year before it stopped. And yet, still, from that period of time, the year after he was given notice, he continued to let them have this access. I'm sorry. Let's talk about that. There's testimony that he was told by the gym teacher? Yes. Okay. And there is evidence that he, at a staff event, his secretary told another witness that he was angry at his son for watching the locker room tape. And so by the spring of 02, the winter of 01. So we've got two things. We've got the statement from the gym teacher, and we've got the locker room tape. And the statement from the gym teacher was what? Well, there are different versions of that in the record. One is the girls. Why don't you pick the best one for you? Well, her quote under oath in the deposition was the girls think they're being videotaped. Another teacher, Doherty, testified that she actually said in the locker room as well. And so either way, this is the woman whose office is in the locker room who's coming to the teacher. There's only one location on campus where students are showering and changing. She's not saying I saw something or I know something. She's saying the girls' things are being videotaped. That's what's in the record. And one of the issues, Your Honor, that's up on appeal is the fact that after discovery closed, after briefing had closed, we received a sheriff interview of another student who said, I told Arlita Fenner about the videotape as well. We were denied the right to depose her in this action after learning that fact. So, no, it was not probed exactly what else she said. The other issue, however, is the significant evidence that's in the record to show the physical signs of the taping, the signs that any individual who was in that locker room should have known. Before we get to that, let's talk. You said there were two things. There was the statement of the teacher. And I do want to get back to the external signs. And then there was the fact that he was mad at his or angry at his son for watching this tape. Now, tell me a little bit about that. Okay. Nancy Pembleton, who is one of the schoolteachers, in a sworn statement to the sheriff, a written statement as well as an oral statement, told him that Brock's secretary told her he had missed a particular social event in the spring of 2002 because he was home, because he was mad at his son for watching videotapes. Ms. Pembleton also testified that at that same time there was a staff meeting. What videotapes? What did he know about the videotapes? That's the point, Your Honor. By the spring of 2002, videotapes, the locker room tapes we are talking about, had gotten out around the schools. Students were showing them about this one. It's a one-building school. They were showing it during school, in the hallways, during passing periods, in front of teachers, talking about it in classes, over and over and over again. And at this same time, Mr. Brock misses a social event, and his secretary tells Nancy Pembleton he's home because he's mad at his son for watching videotapes, that videotape. His son testified he was one of the individuals who was watching this tape and passing it about. In addition, the principal at this same time, in the spring of 2002, has a staff meeting where he's asked by staff what's happening with the videotape. And again, he tells them it's being handled. He's telling them that Brock is handling it. By the spring of 2002, the defendants and the other staff at Powell County High School knew about the tapes because the tapes had gotten out, and they were being shown around that school. So it is, in addition to Ms. Fenner, under oath, swearing that she told her boss and them not disputing that, there is evidence that they knew because the tapes themselves were being shown around. You're down to about four and a half minutes. Yes, if I could save the remainder in time for rebuttal. Could I ask a question? Sure. You might think about it while you're waiting. But how do you elevate? What evidence elevates this behavior on the part of the faculty and superintendent or the principal above ordinary negligence and make it state action? Because I get the impression there's quite a bit of negligence here after Pembleton and Fenner are talking about these paparazzi taking the pictures. But that's after the fact. What happened after that that creates state action that should have been stopped by the faculty? And am I allowed to talk about that on rebuttal? Or do you need me to address that? Well, I'd like to hear about it sometime. Okay. If I could, I'd like to stay. You just go ahead and ask Ms. Goodwin's question. We'll still give you four and a half minutes for rebuttal. Okay. Thank you. This is free time, okay? Okay. Thank you very much. Part of it is that there is a known or obvious risk, and I think part of what you have to put this in context in is what had happened before that notice, that there were physical changes to the locker room. There was a mirror installed six feet high in a girls' locker room that was too small for any girl to be able to use it, which looked strange, which every student who saw it, boy students as well as staff that we deposed said, yeah, I saw that, and I thought that was really odd. There were orange cords going up white walls with holes into ceilings back down. There were black lockers brought in, put on top of the yellows. Was that in the girls' locker room? These were in all the locker rooms. They did this in the boys' as well as the girls', because during tournaments, the girls' used all the locker rooms. There were mirrors at the back of lockers, holes cut out of them, stuffed up against glass, so the person whose locker it was would never use it. The only person who would see the mirror was the person on the other side. And, again, we have sworn testimony of the students and the staff who saw these as they were happening, saying, yeah, I saw that, and I thought it was odd. The problem is that the defendants in this case are the only individuals who claim they either didn't see it or didn't think it was odd. And I believe there is sufficient precedent from this court that when something is so obvious, you have to presume that it's known. Okay. Your free time is up. Thank you very much. We'll hear from the other side. Thank you, Your Honors. My name is Katie DeSoto, and I'm here today with Larry Daly, and we represent the individual defendants as well as the school district in this case. One of the things that I think has to be acknowledged at the outset is that all of the facts that the plaintiffs are bringing up today as reasons to take this case back down to the district court were actually assumed to be true by Judge Malloy in his order. And when you read the order, everything that the defendants are stating now were disregarded. All those facts that were disregarded, the judge actually took to be true. So, for example, the fact that Arlita Fenner told Joe Brott in the spring of 2002 the girls think they're being videotaped, Judge Malloy assumed that to be true. Even the Austin McHugh issue, which none of us found out about until after discovery had closed, that he claimed he told Mrs. Fenner about the videotape. You know, we do understand how summary judgment works, and I don't think there's anybody here who suspects that Judge Malloy didn't. No, no, I'm not being facetious. But the question is, for example, what inferences you can reasonably draw from the fact, which I understand Judge Malloy assumed to be true, which we all are assuming to be true. But then there is, aside from the bare facts, you also have to add a layer of inference, of reasonable inference, that you think a jury could draw from the facts. Certainly. So that's really what we're talking about. We do understand that Judge Malloy did his job and assumed everything to be true. But, you know, for example, I don't quite know what to make of this conversation that the gym teacher says she had with the superintendent. Superintendent Brott, yes. Where she says the girls say they're being taped in the locker room, you know, depending on how much. That's right. And I don't know. I mean, you know, what should the superintendent do? Assuming that conversation did take place, we have to assume that. Can he just ignore that? Well, assuming that it took place, what Mrs. Fenner says that she said was that the girls think they're being videotaped, and that's really all that she said. There is hearsay evidence to suggest that she said in the locker room, but that woman wasn't there present at the conversation. Well, wait a minute. How does hearsay play into that? Hearsay plays its role at trial, does it not? But when it comes to the question whether someone has been apprised of a situation, apprised of a risk, does that person say, well, wait a minute, I looked at 803, and 803 doesn't cover that, and therefore I can ignore it? That isn't the way that the real world works, is it? No. I think what happened is that the judge, when he was considering it, I don't know how the judge actually considered it, whether he said the locker room or just that the girls thought they were being videotaped. We're talking about the person to whom the statement is made, not the judge at this point. Okay. Because, as Judge Kosinski points out, the issue has to do with not only the facts that have to be assumed, but also what reasonable inferences may be drawn from those facts, all of which have to be taken in the plaintiff's favor. Well, I think that even if you assume what she said was that they were being videotaped in the locker room, what you have to look at is the structure of 1983 liability. So, in other words, what Joe Brott would have to do, what we would have to look at, is whether the conduct complained of was under the color of state law, whether it was a constitutional violation. The fact that somebody may be looking at somebody doesn't raise any type of invasion of privacy to a constitutional violation. There has to be state action. So, in other words – And who is not a state actor? The person to whom the statement is made, assertively, not a state actor? No, he is a state actor, but does he have fair notice that there's actually a constitutional violation occurring? That's what I think the analysis is. No one's denying that Joe Brott's a state actor. He's the superintendent of the school. Okay. I mean, I think that's a very good point. Let's say that the children, the boys, are not state actors. They're not employees. And I realize that's a claim here based on the fact that they are employees, but let's put that aside. So, the superintendent is told – and let's embellish the fact just a little bit here by the gym teacher – I have discovered evidence that there's a video camera in the girls' locker room that's pointed right at the showers, and I haven't really followed up where it leads to, but as best I can tell, a bunch of boys are videotaping the girls taking showers. Okay, let's say they've been that explicit. Okay. Are you saying that the superintendent could say, well, you know, the boys are not state actors. They are boys. Boys will be boys, and they're not state actors, and therefore, I don't need to look into this because, you know, it's not the school doing it. It's just boys doing it. You're not taking that position, are you? No, that's not my position at all, Your Honor, because I think that the hypothetical that you just set out contains actual, specific, firsthand knowledge of an ongoing – I mean, actual facts of what is going on. So, in that case, I think that the superintendent or any school – It's not any different on the point of whether or not he knows there's a constitutional violation going on. You know, what you said is he doesn't know that whatever's going on is being done by state actors. So, my hypothetical doesn't vary that in the least. It's still a bunch of boys doing it on their own network. So, all I've done is I've made it more explicit. I've given more information as to the inferences that the superintendent can draw. So, if you buy into my example and you say that he has a duty to investigate and perhaps remove the camera in my example, then it seems to me now we're bickering about whether or not he has enough information to have to conduct an investigation. And why doesn't he? If the gym teacher comes along and says, I think – you know, the girls think that they are being videotaped in the locker room. And, again, we're reading the evidence most favorable to the plaintiffs. Why doesn't he have a responsibility very quickly to dispatch a team of people who are equipped to figure out such things as to whether or not videotaping is going on with electronic equipment and, you know, able to bore into the walls and look into the ceilings and look at the electronic connections and figure out whether it's possible there's a camera there. I think, Your Honor, that comes back to the concept of deliberate indifference versus mere negligence. And so what you pointed out in the initial argument, which is that this may be evidence of negligence, I think deliberate indifference requires a higher showing. It requires an unusually serious risk of harm actually known to that particular defendant and the vocal blindness to it and then the failure to take obvious steps to address that known and serious risk. I think those concepts are fundamentally different because negligence does happen. Let me change the hypothetical just a little bit. Let's say the gym teacher comes along and says to the principal or the superintendent, the girls tell me they saw somebody has a gun in one of the lockers. Okay. You think he can just say, well, you know, he'll say, well, the girls know from guns anyway. We won't investigate it. We will not go and open up the lockers and look for that gun because, you know, it's not very good information. I mean, it's not any more information, but now you're dealing with a gun. And if there is a gun there, somebody pulls it and starts shooting, then you've got some dead girls. How is that different from our case? I think the distinction, Your Honor, is that the – Or would you say he can say, well, I'll wait? No. No, Your Honor, I wouldn't. I think the distinction is that – Good call. I think, Your Honor, that the distinction is that there's no one who can say that having a gun doesn't carry with it an inherent risk of danger. So, for example – Well, I'm sorry, but, you know, I must say a video camera in the locker room carries danger, too.  It's not a mortal danger, but surely a video camera in the girl's locker room is the kind of thing that most moms and dads and most girls assume will not be there. I mean, I can't imagine – I mean, let's just say that, you know, one of the girls said they saw – she saw a camera in the locker room. I mean, that's the kind of thing that doesn't belong. I think you're right, Your Honor, but I think in terms of looking at what Joe brought and knew at the time, what he was told, what Mrs. Fenner says he was told, was that the girls think they're being videotaped. So he doesn't know where. So the locker room – So what you're saying is if what he's being told concerns a gun, it's exactly the same amount of information, he needs to go in there and find that gun. But if he is told the same thing about a camera, it's not sufficiently concrete that he needs to go in and look for it. Well, I think the distinction, Your Honor, if you want to go back to what you said before, you're right. People – I think most people would say if I knew I was being videotaped in a bathroom or locker room, I would be greatly outraged. But if you said I was being caught on camera while I was going through the cafeteria because they're filming a school-based film, I wouldn't consider that necessarily a problem. So I think some of it depends on the nature of the danger that you're talking about. There's no place on the school grounds where a gun would be considered acceptable. You simply can't have weapons on school grounds. There's laws against it. Does the record show when these one-way mirrors were discovered and by whom? Well, the record is unclear. We have – in the record, there are two receipts that show that the first two-way mirror was purchased in January – or January, February of 2002, and the second in the summer of 2002. When did the – when did the responsible official know that these – we call the mirrors the smoking gun, the unsmoking gun. Sure. It doesn't smoke yet. When did the responsible official know that the mirrors had been installed? They knew about the mirrors in November 2002 when this whole scheme was uncovered. And, Your Honor, one thing I want to make clear, too, is that, you know, in order – we haven't really talked about in our discussion here today, but for municipal policy to actually be the moving force behind it, you have to show that but for that policy – I mean, that the policy really caused the constitutional harm. One thing I think that has to be said at the outset is that this scheme was concocted, implemented, and well underway long before these boys were even potentially considered employees of the school. They were school – they were hired for these basketball and volleyball tournaments to be towel boys, very limited purpose, limited in scope, three-day events. Other than that, they were not school employees at all. And so I think that one thing you have to remain really clear about is that these were private actors doing something on their own. And I think the case law is really clear that – Nobody is contending that the school officials were the cause of the occurrences. It's rather that once they were on the assumption most favorable to the plaintiffs, once they were apprised of the situation, that their conduct at that point is what triggers potential liability in constitutional terms. So they don't have to be shown to have – they didn't install the cameras, but nobody is claiming that. Right. And that's really not integral to the plaintiff's case, is it? I think there's case law, though, that says that if there is no underlying constitutional violation, there can be no municipal liability and also no supervisory liability. Somebody – I get in the remote precincts from which I emanate, nobody seems to understand Monell either. But I got to tell you, no, it does not depend solely on policy or custom. An act by a decision maker suffices to create liability under Monell, right? It does, Your Honor, if he's the final policymaker. And if the act of the policymaker is, in this instance, failure to act with a known risk, isn't that sufficient under Monell? If Joe Broad was the final policymaker, that might be correct. However, under Montana state law, Joe Broad is not the final policymaker. The Powell County School District High School Board is the final policymaker. And so in this situation, he's simply not – you can't attribute municipal liability under that theory. So for the purpose that we're talking about, he's not the one who calls the shots? You're saying that every decision has to be made by the school board? No. If you're talking about actual policy, policies, customs, habits – You don't need policy, custom, or habit. You can have an event. That's what the third alternative is under Monell. Right. Yeah. So it doesn't have to be a policy or a custom to establish potential liability under Monell, does it? No, but I think the final policymaker has to be making that final decision based on his ability to do so. And I think the evidence of Joe Broad isn't that he made a deliberate, conscious choice not to act. It's just that he, perhaps negligently, failed to act. And that's a distinction. There has to be a deliberate and conscious choice among an array of potential choices to do something in a certain way. And here we have no evidence of that. Let me get back, if I may, to the – you said that this all came into play before they were hired. But wasn't one of the boys an assistant to the girls' coach? Yes. And he had keys. No. And he had access to the girls, but he had to go to the coach's office, which was in the girls' locker room. Am I confused about that? Well, maybe I can clarify it for you a little bit, Your Honor. His junior year, which would have been 2001, 2002, so this scheme is already in play by then. At that point, Ben Frankfurter was the student aide for Arlita Fenner, who was the girls' coach – or girls' gym teacher. That's not a paid position. He's not an employee. He was never given keys by Arlita to have. She would say things like, I forgot my keys. Go check in the girls' locker room. Make sure no one's there. Come back and get them. At no point were these boys ever given wholesale, 24-7 access to the locker rooms. I'm not sure where that theory has come from. There's no evidence that these boys had keys or actually used keys. In fact, if you read the record, the boys themselves stated they didn't have keys. They didn't need keys because they were pretty careless about leaving everything open, popping open doors and all that. During the day, like most buildings during the day, when you go to gyms and schools, the doors aren't locked. Well, girls have to use the bathroom, and so the doors aren't locked. Another thing that I think is important, Your Honors, is that while the boys were allowed to be cowboys and so forth, there's also nothing in the record to suggest that they were ever sent in there with the teachers or coaches or athletic director, ever knowing there were girls in the room. So, for example, all of them testified they knew they weren't supposed to be in there when girls were in there. They were told to knock on the door, make sure no one was there. If someone's in there, you can't go in. Well, you do assume a certain amount of upbringing on the part of the boys that they had known. What they were doing is what they're not supposed to be doing. Sure. You don't necessarily think that school authorities have to lecture them not to be keeping tabs. At the same time, there comes a point when there's enough smoke where the school authorities do have a responsibility to look into it. What about that tape? The whole incident with the tape being shown around the school and the superintendent being mad at his son for watching the tape. How does that play into it? Well, I think there's no direct evidence the superintendent was mad at his son for watching the tapes. We do know that his son watched the tapes, but this is all what we know after the scheme was uncovered. There's no evidence in the record that teachers knew these tapes were being shown, that teachers heard kids talking about these tapes, or that any teacher saw that tape – and it's one tape, actually – that any teacher saw that tape themselves. So basically what the plaintiffs would want you to say is that, well, look, if all these kids knew about it, how is it possible that teachers didn't? Well, I think common sense dictates that there's an awful lot that teenagers do that parents don't know, that teachers don't know, that superintendents don't know. What about that statement that the superintendent missed the social event because he was home chastising his son for watching the tape? Again, Your Honor, I mean, I know I don't want to get into the difference between hearsay and non-hearsay, but there's no direct evidence of that. Joe Brock testified that he didn't know about – What if you don't need direct evidence? Well, you need evidence that would be reasonable to make an inference from. So, in other words, in the totality – and say, you know, yeah, he knew all about the tape. Look, he even stayed home and had his son deride that for watching the tape. Well, I think you can look at that in this way, Your Honor. The woman from whom that statement came is a woman named Nancy Pembleton, and she wrote that in a statement to the sheriff. When she was deposed, she said, I was mistaken about the date. And now there's confusion about the date, and we don't know. But what Judge Malloy said was, well, look, in the totality of all the evidence, you look at this. Nobody but Nancy Pembleton says this. Even she says it wasn't right on the dates, and so, therefore, it's not sufficient to raise a reasonable inference. So I've made a judgment about credibility in the course of ruling on a motion for summary judgment. Is that what you're saying the district judge did? No, I don't think so, Your Honor, because it's the issue of credibility if the woman says, this is what I said, and the judge says, I just don't believe you. But what this woman said was, no, I was wrong. This was after the tapes were discovered. So the judge isn't judging her credibility. He's saying, look, even she says that it was after the tapes were discovered. Well, why couldn't the jury say, look, when she went to the police, she was telling the truth, and then maybe she discovered that this wasn't warmly received by the school, who thought this would implicate them in a possible liability, and she, therefore, had reason to change her story. Not lie. You know, people don't necessarily lie in their circumstances, but, you know, their memories are affected by pressures. And why couldn't the jury say, look, she comes forward, she gives a voluntary statement to the police, that's the best indication of what she knows, and her later statement, after the lawyers have gotten to her, and after she made clear to her that she really has no future in the school, she sticks by her story, and maybe it's not as believable. Now, I know it's not a thing like that would happen in Canada, but let's just, maybe a jury could see it that way. Why is that a possible inference? Well, I think you have to, I mean, I think it comes down to reasonable inference versus conceivable inference. And I think that what the judge did when he looked at this was say, there's no other evidence to support this. The woman who says this says it's not true. Therefore, is it a reasonable inference? Let's assume the jury says it is true. What does that give the plaintiffs? Let's say he, they say, yeah, you know, we believe that that was what, in fact, happened. That she said that, and that is, in fact, the truth. He stayed home, and he let his son, the riot act, go out of the state. What else can they reasonably draw from that? What inference can they draw from that? You would think that he stays home and reads the son, the riot act about this, that he probably demands a tape and says, I want to see it right now. Well, we don't even know. They could defer that, couldn't they? Well, they could, but we don't even know from her statement what videotape they're talking about. Because the statement isn't clear that they're talking about a videotape that Lucas Brott saw with naked girls on it from the locker room filmed in Powell County High School. The statement simply isn't that broad, and it doesn't provide such notice. So you're saying the audiovisual class had a general course in videotaping? Is that the suggestion, or how did we know that's the tape that was meant? We don't know that that's the tape that was meant. We really don't know. Okay. We are over your time. Thank you. We promised you 4 1⁄2 minutes, and you should have them. Thank you. I'll try to be very fast. The issue here is whether or not there were sufficient questions of fact that a reasonable jury could have found in favor of the plaintiffs on some of these claims. And what exactly, just to make it clear for us, what exactly would they have had to find is sort of the state of mind of the defendant? What would they have had to infer? Actual or constructive notice, not actual notice. Deliberate indifference to a risk of harm. I think that the evidence is there. If you look at the statements that were actually in the record, and there are numerous ones, Nancy Pembleton never said she got it wrong. She said at her deposition that her statement made in the spring of 03, when she used the words last spring, really meant that spring, spring of 03. And the reason she said that was it was all based on the date of her husband's death, which she then believed was 2002. We later pointed out to her and to her lawyers that her husband, in fact, died in July of 01, which moved everything back to the year of her sworn statement to the police. She issued a written statement as well as an oral statement where she stated at ER 753 to 754 in her written statement, he's really mad, so he's staying home with his son tonight. He and his girlfriend were caught at Chrismore's watching the locker room videos. She again said in her statement to the sheriff, ER 413, that he was one of the boys caught in Chrismore's Basin watching the locker room videos. Very clear, everyone knew when they were talking about the Duncan staff meeting, when they were talking about the brat being mad at his son, they're talking about the locker room videotape from Powell County High with naked girls that was shown throughout the school. The issue of the two-way mirror, the defendants keep trying to argue there's only one date of when these mirrors popped up, and that's wrong. Again, questions of fact. If you look at the testimony of the boys who were in the locker rooms, back in October of 01, Lucas Brott, the superintendent's son, as well as several other boys, testified to seeing that little tiny mirror that wasn't supposed to be there until January of 02. Austin McHugh testified to the sheriff that he found it in August of 01 and immediately told Arlita Fenner. So the mirror is up a whole lot sooner than the invoice that they keep trying to pin it on. And I agree with you, that is one of the many smoking guns that they should have realized, gee, there's a hole in our wall and a mirror that didn't used to be there and we didn't put it there. Frank Furter was Arlita Fenner's student aide his sophomore year, not his junior year. Frank Furter told Arlita Fenner in January, I'm sorry, in 2001, that he had a key to the school. She said this in a sworn statement to the sheriff. She has never disavowed that statement. There are several statements about locker rooms the defendants saw, including in this dual yearbook, which came out in the spring of 02 and all of the defendants saw, which said that the worst thing about Powell County High was the cameras in the bathroom and the perfect 10 was the locker room videos. These were things the defendants knew, why they didn't do anything about it. There were a lot of crazy statements in the yearbook and there were some crazy statements. There was one about the dwarf. Yes. I mean, people say all sorts of things in the yearbook, but they have no relationship to reality. But the issue is what should have given them notice, and the principal, Duncan, testified that the cameras in the bathroom comment was disturbing. I must say, of all the things you listed, the yearbook testimony is probably the least persuasive. In addition, in the Flores case, this court held that a single report of a constitutional violation was sufficient to constitute deliberate indifference. You have that single clear report to Brott. In addition, we cannot forget that Brott and McDermott bid for these tournaments. They brought these girls to these locker rooms. They continued to do that after Arleta Fenner told him about the violations. They continued to place the boys in the locker room with unsupervised access, and they continued not to warn, not to change, and to do absolutely nothing to stop the violations. Deliberate indifference is the conscious disregard for a high risk of a constitutional violation. It is more than mere negligence. But you have sufficient evidence in this record that a reasonable jury could clearly find that the defendants were deliberately indifferent to the violations of the plaintiffs. In fact, I think it would be highly unlikely that a reasonable jury would find the other way. Okay, thank you very much. Thank you. Well, it's an interesting case. Any chance that this case might be settled? We have a mediation service here at the 9th Circuit. You've all learned a lot more by hearing the oral argument. You've heard our questions, and if you listen carefully, I think you'll probably know a little more about your case after the argument that you did walking in. And, you know, you see a counselor present here, and perhaps some of the clients are present as well. And I'm wondering if there's any chance that, in light of all of this, there might be a possibility the parties will want to make this case go away. I see a great deal of enthusiasm here. That never happens in my courtroom. Your Honor, the subject of trying to resolve this has come up. It's difficult because this case doesn't stand alone. And because of how other parties are situated, it makes it very difficult to deal with this one, separate from all of them together at the same time. And so we've never had a proposal that would embrace a method that would deal with the entire situation. And I recognize and I appreciate the Court's suggestion that there ought to be. There are a number of other matters here that are significant. There's the privacy interests of non-plaintiff students, and, you know, if we should reverse and remand, we have the publicity of a trial, and, you know, it's a nightmare. I'm not saying we will. I don't know what we'll do. But you've certainly heard that we've had skeptical questions here about the future of this case. I don't think either side can count on a victory here walking out. And this is the kind of thing that, you know, you have to take into account the consequences of losing and the possibility of losing and how this will. You know, we would, and I, you know, told my colleagues, we would certainly be willing to defer submission of this case for a while if you think there's any chance that we have an excellent mediation service here in the Ninth Circuit. We have an excellent mediator here actually in Seattle who, you know, they have, our mediation service has managed to settle death penalty cases, believe it or not, which is a hard thing to settle, criminal cases involving death penalties. So, you know, we would be happy to defer submission for a little bit to at least give you a chance to talk and consider and explore possibilities. And this case could be solved in a way that doesn't ultimately result in a published opinion or a public trial or anything of that sort that, you know, everybody might be better off. But the settlement would be public. Pardon me for a second. Keep in mind as well that one of the things that has not been talked about in oral argument is the issue of class certification, which was denied below. But if Judge Kaczynski's suggestion were to be followed, that's a matter that could be addressed as well in conjunction with any effort at court-assisted mediation. One of the things I should mention, one of the biggest impediments, I think, is the difference in opinion between Counsel West and the scope of this case. The fact is that we've got 18 named plaintiffs. Out of those 18, only three are in any stage of nudity. Statistically, any stage of nudity on the tapes. Out of the 18. In a companion case, we have 90 girls and only six are in any stage of nudity. We also have an absolute impossibility to identify class members beyond those who are on the videotapes because the boys don't know who they might have viewed. The girls don't know if they were viewed. There's no evidence. So you can't put together who is in the class. So going beyond the number of 18 named plaintiffs becomes very difficult, and obviously the appellants have a different view on the scope. The boys testified that the scope of what they did was far, far less than is being proposed by the plaintiffs. So we have a huge difference in opinion as to the scope of the entire thing. Then the damage question, I know we didn't get into it, but the question is whether someone has a right of privacy and whether you're damaged, even if you're completely clothed. Well, that raises the question. The first thing you say sounds to me more like the stuff of which dickering is made. I'm sorry? Dickering. Do you know the term? Yes. To whom you talk from negotiations. And the implications for the school and for the plaintiffs and further invasion of privacy of everybody involved, I mean, I would think that we forget that counselors, lawyers traditionally have been healers. They've been people who have tried to solve problems. Litigation is a last resort, but it's a very sad last resort when all else fails. And there's a lot to be said for giving another tie to trying to come to grips with this case. We might wind up affirming, and this might be the end of the case. I don't know. We haven't voted. We haven't discussed it at the conference, but I think there's some chance we won't, in which case the problem would back in Montana with Judge Malloy and all of you, and maybe everybody would be better off if you solved it. Why don't we defer submission for two weeks, and why don't I start counsel. This is our courtroom deputy clerk, and she will instruct you of the Yes, I knew that. I was going to, but you know how he can be reached and the like. And, you know, it's still before lunch. Why don't you all at least contact the mediator and give it a try? Give it a try for the sake of your clients and for the sake of your community. I mean, this is obviously a terrible thing that's happened, and the effects of whatever happens legally, you know, it's going to continue tearing the community apart. And the best thing to do would be to put it to bed one way or the other, you know, have it in the past and let the wounds kind of heal. I think you're right. Why don't you maybe give it one more time? We'll defer submission for two weeks. And if we hear from counsel at the end of the two weeks that they are on the path to what they think is a possible resolution of the case, we'll keep deferring as long as counsel wishes to. If we do not hear otherwise, we will submit the case, and we will decide it. And, you know, it's like that movie, right? He who sows. Appreciate it. I'm certainly willing and I'm sure. The whirlwind shall inherit the wind, you know. It's terrible stuff litigation, terrible stuff, terrible. So we will defer submission for two weeks, and I hope that we will hear from counsel at that point, or you can communicate to us through our mediator. He can let us know if you need more time. If you want more time at that point, you think it's helpful, we will continue to do so. If not, I can assure you we'll decide the case very quickly. Whatever happens to it will happen quickly. Okay. Thank you. Thank you for a very helpful argument on both sides. Both counsel were very helpful. Thank you.
judges: Goodwin, Kozinski, Shadur